AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

INFORMATION ASSOCIATED WITH SNAPCHAT
USERNAME CABUDI877 AT HTTP://SNAPCHAT.COM/
THAT IS STORED AT PREMISES CONTROLLED BY
SNAP, INC.

)
)
)
)
)
)

Case No. 2:16mj 627

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2339B | Providing material support and resources to a designated foreign terrorist organization. |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

T. Gregory Naples Jr. FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Dec 15, 2016

_____
*Judge's signature*

City and state: Columbus, Ohio

Kimberley A Jolson, US mag, state judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
**SNAPCHAT USERNAME CABUDI877** AT
HTTP://SNAPCHAT.COM/ THAT IS
STORED AT PREMISES CONTROLLED BY
SNAP, INC.

Case No. 2:16mj627

Filed Under Seal

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, T. Gregory Naples, Jr., being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for

information associated with a certain account that is stored at premises controlled by Snapchat, a

company headquartered at 63 Market Street, Venice, California 90291. The information to be

searched is described in the following paragraphs and in Attachment A. This affidavit is made in

support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A) to require Snapchat to disclose to the government copies of the information

(including the content of communications) further described in Section I of Attachment B. Upon

receipt of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI), Cincinnati

Division, Columbus Resident Agency. I have been a Special Agent for 14 years and have been

assigned to an International Terrorism Squad for six years and Joint Terrorism Task Forces

(JTTF) for eight years in both Washington, DC and Columbus, OH. I have been involved in the

preparation and execution of numerous federal search warrants for various types of violations.

During my current assignment to the JTTF, I have been a Case Agent and Co-Case Agent for multiple international terrorism investigations. While assigned to the JTTF, I have received specialized training in international terrorism. Furthermore, I have received training in computer-related crime as well as the criminal use of email, social media, encrypted messaging applications, and telephonic communications.

3.      The statements contained herein are based on an investigation conducted by the Affiant and others, on his experience and training as a Special Agent on the JTTF, and on other relevant information provided to him by other FBI Special Agents and law enforcement officials. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of the Affiant's knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2339B (providing, attempting to provide, and conspiring to provide material support to a Foreign Terrorist Organization ("FTO")) have been committed by ABDUL RAZAK ALI ARTAN (hereinafter referred to as "ARTAN"), who, according to immigration paperwork filed with the U.S. government, is a native of Somalia who left Somalia in 2007 with his family to live in Pakistan and came to the United States in 2014 as a refugee. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

2

## DESIGNATED FOREIGN TERRORIST ORGANIZATION

6.      On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

7.      On May 15, 2014, the Secretary of State amended the designation of AQI as a FTO to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. In an audio recording publicly released on June 29, 2014, ISIL announced a formal change of its name to Islamic State. On or about September 21, 2014, ISIL spokesperson Abu Muhammad al-Adnani called for attacks against citizens—civilian or military—of the countries participating in the United States-led coalition against ISIL. On September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL, and ISIS. To date, ISIL remains a designated FTO.

## SUBJECT ACCOUNT

8.      On December 2, 2016, Snapchat provided records responsive to a grand jury subpoena that indicated a Snapchat account with the username **cabudi877** is associated with telephone number 614-815-0162 and email address of the same name (cabudi877@gmail.com). ARTAN's cellular telephone was an Apple iPhone 5s, Model A1453, IMEI: 352034064531307, telephone number 614-815-0162. I know the cellular telephone belonged to ARTAN because it was found in the vehicle driven by ARTAN during the attack. During the FBI JTTF interviews

3

of the family, the family members confirmed ARTAN's phone number was 614-815-0162. I know the ARTAN's email address is cabudi877@gmail.com through Huntington National Bank and The Ohio State University records, which revealed that ARTAN used this email to open his Huntington National Bank account as well as setup his Ohio State University student email account.

## PROBABLE CAUSE

9.    On November 28, 2016, at approximately 9:42 AM, a black male subject was driving a vehicle in the area of the intersection of West 19th Avenue and College Road North on The Ohio State University campus. According to reports from the scene, the subject purposely struck and attempted to strike multiple pedestrians with the moving vehicle. The subject subsequently exited the vehicle and stabbed and attempted to stab numerous people with a knife. A local officer responded to the scene, encountered the subject, and fatally wounded him. A driver's license found on the person of the subject identified him as ARTAN, date of birth January 1, 1998, Ohio Driver's License #UJ847597, with an address of 353 Nationwide Boulevard, Columbus, Ohio. An Apple iPhone 5s and Dell Laptop Model P51F were also found in the vehicle with ARTAN. There were approximately fourteen (14) victims as a result of this attack.[1]

10.    On or about November 28, 2016, the FBI conducted a search for any social media presence/activity related to ARTAN and identified the following Facebook page as belonging to him: https://www.facebook.com/abdi.razaq.3 . The photo on the Facebook page appeared to

---

[1] In prior affidavits, your affiant noted that there were approximately nine (9) victims. I have since learned that there were approximately fourteen (14) victims from this attack.

4

match the photo of ARTAN from the driver's license recovered from him at the scene of the attack. At approximately 9:49AM[2], which appears to be the time period just prior to the attack, ARTAN made a public Facebook post which stated in its entirety:

In the name of Allah, the most merciful and the most gracious.

(Screenshot this before it gets deleted)

My brothers and sisters, I am sick and tired of seeing my fellow Muslim brothers and sisters being killed and tortured EVERYWHERE. Seeing my fellow Muslims being tortured, raped and killed in Burma led to a boiling point. I can't take it anymore. America! Stop interfering with other countries, especially the Muslim Ummah. We are not weak. We are not weak, remember that.

If you want us Muslims to stop carrying lone wolf attacks, then make peace with "dawla in al sham." Make a pact or a treaty with them where you promise to leave them alone, you and your fellow apostate allies.

By Allah, we will not let you sleep unless you give peace to the Muslims. You will not celebrate or enjoy any holiday.

Stop the killing of the Muslims in Burma.

Btw, every single Muslim who disapproves of my actions is a sleeper cell, waiting for a signal. I am warning you Oh America!

Ano, a message to the Muslims, don't listen to celebrity scholars who sold their deen. I am talking about the likes of Yasir Qadhi, Omar Sulleman, Nouman, Mufti Menk and the

---

[2] In prior affidavits, your affiant noted that the time was approximately 9:30 AM to 9:45 AM. I have since learned that the time was approximately 9:49AM.

list goes on. Beware of Al-Maghrib Institute. Listen instead to our hero Imam Anwar Al-Awlaki.

Let me ask you this question if the Muhammad peace and blessings upon him and his Sahaba were here today, Wouldn't the Western Media call them terrorists?
To conclude.

By Allah, I am willing to kill a billion infidels in retribution for a single DISABLED Muslim/Muslimun.

(Screenshot this before it get deleted)

11.     Based on my training and experience, your Affiant understands the term "lone wolf attacks" to refer to a terrorist who commits violent acts alone, even if he/she is influenced or motivated by an ideology or a terrorist organization. Additionally, your Affiant understands that the phrase "dawla in al sham" is another term for ISIL. Moreover, based on my training and experience, your Affiant also understands that the individual referred to as "Imam Anwar Al-Awlaki" is Anwar Al-Awlaki, the now-deceased American-born Islamic lecturer and Al Qa'ida in the Arabian Peninsula (AQAP) leader who espoused violent jihad against Westerners and encouraged the emigration of foreign fighters to countries around the world to engage in violent jihad. Based on my training and experience, your affiant is aware that many ISIL supporters watch and listen to recordings of Al-Awlaki's calls and purported justifications for engaging in violent jihad. AQAP also publishes an English language magazine called *Inspire* that contains propaganda espousing how to conduct various terrorist attacks.

12.     Based on my knowledge and experience, jihadist propaganda has long counseled followers to commit acts of violence like the one allegedly committed by ARTAN; i.e., by using vehicles and knives as weapons. For example, the Fall 2010 issue of *Inspire* Magazine, a

6

publication by the media arm of AQAP, described such an operation. It encouraged jihadists to "use a pickup truck as a mowing machine, not to mow grass but to mow down the enemies of Allah." More recently, the Autumn 2016 issue of *Inspire* Magazine, encouraged "lone mujahids" to commit acts of violent jihad "using a truck as done by the Lone Mujahid in the Nice operation." Similarly, the July 2016 issue of *Dabiq*, ISIL's initial official magazine, praised the "brother" who answered "the Islamic State's calls to target nations participating in the Crusader coalition fighting the Caliphate" by "killing more than 80 people and injuring more than 300 others" in the Nice attacks. In September 2016, ISIL changed the name of its official magazine to *Rumiyah*. In November 2016, ISIL released *Rumiyah, Issue 3*, which has an article titled "Just Terror Tactics," which again focuses on a vehicle attack as a primary attack weapon with a secondary attack using a knife or gun to maximize the "kill count" and terror. Some of the highlights in the article state the following:

"Though being an essential part of modern life, very few actually comprehend the deadly and destructive capability of the motor vehicle and its capacity of reaping large numbers of casualties if used in a premeditated manner."

"The method of such an attack is that a vehicle is plunged at a high speed into a large congregation of kuffar, smashing their bodies with the vehicle's strong outer frame, while advancing forward – crushing their heads, torsos, and limbs under the vehicle's wheels and chassis – and leaving behind a trail of carnage."

"Applicable Targets: Large outdoor conventions and celebrations, Pedestrian-congested streets, Outdoor Markets, Festivals, Parades, Political Rallies"

"In a bid to ensure utmost carnage upon the enemies of Allah, it is imperative that one does not exit his vehicle during the attack. Rather, he should remain inside, driving over

7

the already harvested kuffar, and continue crushing their remains until it becomes physically impossible to continue by vehicle. At this stage, one may exit the vehicle and finish his operation on foot, if he was able to obtain a secondary weapon."

"Having a secondary weapon, such as a gun or a knife, is also a great way to combine a vehicle attack with other forms of attacks. Depending on what is obtained, the kill count can be maximized and the level of terror resulting from the attack can be raised. This could also increase the possibility of attaining shahadah, which is the best of departures from this Dunya into the larger expanse of the Akhirah."

13.     Moreover, during the course of the FBI's investigation into the Ohio State attack, the FBI learned that, on the afternoon of November 24, 2016, which was Thanksgiving Day, ARTAN used his debit card associated with his aforementioned Huntington National Bank account to purchase a GPS device and iPod from a store located in Columbus, Ohio. According to the GPS records, which the FBI subsequently obtained, at approximately 7:39 PM, ARTAN traveled by vehicle to Washington, D.C. with assistance of the GPS device. He arrived in Washington, D.C. at approximately 3:04 AM on November 25, 2016.

14.     On November 25, 2016, at approximately 7:00 AM, video surveillance captured ARTAN purchasing various items, including a machete, at a hardware store located in Washington, D.C. ARTAN used his debit card associated with the aforementioned Huntington National Bank account to make these purchases. Approximately one and a half hours later, ARTAN returned these items, including the machete to the same hardware store. ARTAN subsequently left Washington, D.C. and drove back to Columbus, Ohio. Upon returning to Columbus, Ohio, ARTAN returned the GPS device and iPod to the same store to which he purchased the items the day before. The FBI has retrieved both the GPS device and the iPod

8

from the store.  The GPS device contained information from ARTAN's trip to Washington, D.C., while the iPOD remained sealed and did not appear to be used by ARTAN.  The FBI conducted interviews of ARTAN's family members, all of whom indicated that they were unaware of ARTAN's travel to Washington, D.C.

15.     Although ARTAN did not ultimately conduct an attack in Washington, D.C., based on my training and experience, your Affiant assesses, that ARTAN may have been considering such an attack.  I make this assessment based, in relevant part, to the fact that, while in Washington D.C., ARTAN purchased a machete.  Moreover, ARTAN drove to Washington D.C. on Thanksgiving Day and his later Facebook post references Americans not being able to celebrate or enjoy any holiday.  Finally, ARTAN did ultimately conduct an attack on November 28, 2016 using a vehicle and knife.

16.     On November 29, 2016, on behalf of ISIL's media office, A'maq Agency, Twitter user "Omar Ansary" tweeted in Arabic: "A source to A'maq Agency:  The executor of the American state of #Ohio attack is an Islamic State soldier who carried out the operation in response to calls to target the citizens of international coalition states."

17.     Based on my experience, the behavior displayed by ARTAN during this attack and information found on his Facebook page is consistent with someone who may have been motivated or inspired by social media postings or through direct contact with others on social media to commit acts of violence for the purpose of committing a terrorist attack on behalf of ISIL.  As such, we are seeking evidence of terrorist motivations or other criminal intent as well as any evidence of a conspiracy to commit terrorist acts, potentially involving additional accomplices and other evidence of material support to an FTO.

18.     A review of ARTAN's iCloud accounts revealed that on October 26, 2014,

9

ARTAN had downloaded Snapchat onto his Apple iPhone 5s, which was recovered from the attack and used to upload the aforementioned Facebook post.[3] The Snapchat application was last updated on December 8, 2015. On December 2, 2016, the FBI sent a Preservation Letter Request to Snapchat. A review of records obtained from Snapchat indicate that ARTAN opened this Snapchat account on August 29, 2015. Given that the account was opened in August 2015, the fact that the Snapchat application on ARTAN's phone was updated in December 2015, and the fact that nothing in the information provided by Snapchat indicated that the account had been closed, it is this Affiant's belief that the relevant Snapchat account remains an active account and may contain evidence of a crime.

## BACKGROUND CONCERNING SNAPCHAT

19.     Snapchat owns and operates a free-access social-networking website of the same name that can be accessed at http://www.snapchat.com. Snapchat allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information.

20.     In my training and experience, I have learned that Snapchat provides a variety of features. Snapchat has a feature called "Snaps," which allows the user to take a photo or video using the user's camera phone in real-time. The user then selects which of the user's friends to send the message to. Unless the sender or recipient opts to save the photo or video, the message will be deleted from their devices (after the content is sent in the case of the sender and after it is opened in the case of the recipient). The user is able to save a photo or video the user has taken locally to the user's device or to "Memories," which is Snapchat's cloud-storage service.

---

[3] On or about December 1, 2016, this Court signed a search warrant for ARTAN's iCloud accounts.

21.     Snapchat has a feature called "Stories," where the user can add photo or video Snaps to the user's Story. Depending on the user's privacy settings, the photos and videos added to a Story can be viewed by either all Snapchatters or just the user's friends for up to 24 hours. Stories can also be saved in Memories.

22.     Memories is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from the phone's gallery in Memories. The user can also edit and send Snaps and create Stories from these Memories. Snaps, Stories, and other photos and videos saved in Memories are backed up by Snapchat and may remain in Memories until deleted by the user.

23.     Snapchat also has a "Chat" feature. A user can type messages, send photos, videos, audio notes, and video notes to friends within the Snapchat app using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties – and both parties swipe away from the Chat screen – the message will be cleared. Within the Snapchat app itself, a user can opt to save part of the Chat by tapping on the message that they want to keep. The user can clear the message by tapping it again.

24.     A Snapchat username is a unique identifier associated with a specific user on Snapchat, and cannot be changed by the user. On the other hand, a Snapchat vanity name is not a unique identifier and can be set and changed by a user or that user's friends to indicate how the user will be appear within the app. Unlike a username, a vanity name can contain special characters and symbols beyond hyphen, underscore, or period, as well as spaces, emojis, and capital letters.

25.     In my training and experience, basic Snapchat subscriber information is collected when a user creates a new Snapchat account, alters information at a later date, or otherwise

11

interacts with the Service. Basic subscriber information may include Snapchat username, email address, phone number, Snapchat user vanity name, Snapchat account creation date and IP address, as well as timestamp and IP address of account logins and logouts.

26. Snapchat retains logs for the last 31 days of Snaps sent and received, for 24 hours of posted Stories, and for any unopened Chats or those saved by a sender or recipient. The logs contain meta-data about the Snaps, Stories, and Chats, but not the content.

27. In certain circumstances it may be possible for Snapchat to retrieve the content of sent Snaps. The reason Snapchat often will not be able to retrieve Snap content is that Snapchat deletes each Snap from its servers once all recipients have viewed the Snap. Additionally, if a Snap remains unopened, it will be deleted 30 days after it was sent.

28. As explained herein, information stored in connection with a Snapchat account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with a Snapchat account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, Snapchat communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by Snapchat can show how and when the account was accessed or used. For example, as described below, Snapchat typically logs the Internet Protocol (IP) addresses from which users access the Snapchat account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can

understand the chronological and geographic context of the Snapchat account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the Snapchat owner's state of mind as it relates to the offense under investigation. For example, information in the account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

29.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Snapchat, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

30.    Your Affiant respectfully requests that this Court order that the government is allowed to share the information obtained from this search (to include copies of digital media) with any government agency investigating, or aiding in the investigation of, this case or related matters.

Respectfully submitted,

T. Gregory Naples, Jr.
Special Agent
FBI – Joint Terrorism Task Force

13

SUBSCRIBED TO AND SWORN TO
BEFORE ME THIS 15th DAY
OF DECEMBER, 2016

Honorable Kimberly Jolson
U.S. Magistrate Judge
Southern District of Ohio

14

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with **SNAPCHAT USERNAME CABUDI877** that is stored at premises owned, maintained, controlled, or operated by Snapchat, a company headquartered at 63 Market Street, Venice, California 90291.

2

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Snapchat**

To the extent that the information described in Attachment A is within the possession, custody, or control of Snapchat, including any messages, records, files, logs, or information that have been deleted but are still available to Snapchat, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Snapchat is required to disclose the following information to the government for each account listed in Attachment A:

a.      All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers;

b.      All past and current usernames, account passwords, and names associated with the account;

c.      The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

d.      All IP logs and other documents showing the IP address, date, and time of each login to the account;

e.      All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

f.      All "Snaps," "Chats," sent or received, "Stories," or Snaps, Stories, photos and videos in "Memories;"

g.      A list of all vanity names used by the account;

h.      All photographs and images in the user gallery for the account;

i.      All location data associated with the account;

j.      All data and information that has been deleted by the user;

k.      A list of all of the people that the user follows on Snapchat and all people who are following the user (*i.e.*, the user's "following" list and "followers" list);

l.      A list of all users that the account has "unfollowed" or blocked;

m.      All "lists" created by the account;

n.      All privacy and account settings;

o.      All records of Snapchat searches performed by the account, including all past searches saved by the account;

p.      All information about connections between the account and third-party websites and applications;

q.      All records pertaining to communications between Snapchat and any person regarding the user or the user's Snapchat account, including contacts with support services, and all records of actions taken, including suspensions of the account.

## II.    Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 2339B, those violations involving ARTAN and occurring after June of 2014, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a)     Providing, attempting to provide, and conspiring to provide material support to a Foreign Terrorist Organization (FTO), preparatory steps taken in furtherance of the attack and/or scheme;

2

(b)     Evidence indicating how and when the Snapchat account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Snapchat account owner;

(c)     Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(d)     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e)     The identity of the person(s) who communicated with the user ID about matters relating to the provision of material support and resources to a foreign terrorist organization, including records that help reveal their whereabouts.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Snap, Inc. and my official title is _____. I am a custodian of records for Snap, Inc. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Snap, Inc., and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

      a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

      b.    such records were kept in the ordinary course of a regularly conducted business activity of Snap, Inc.; and

      c.    such records were made by Snap, Inc. as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____       _____

Date                               Signature